Garrett *v.* Moss et al.

---

AUGUSTUS O. GARRETT, Plaintiff in Error, *v.* WILLIAM S. MOSS *et al.,* Defendants in Error.

ERROR TO PEORIA.

Any corrupt agreement among bidders, which prevents competition at a public sale, is a fraud upon the owner, which will vitiate the sale.

An agreement on the part of a senior mortgagor to foreclose and sell only a part of the mortgaged premises, and bid them off in satisfaction of his judgment, is not a fraud upon the debtor, nor is it against justice or equity.

Where a notice of sale under a decree is ordered to be advertised in a newspaper for "three weeks successively," or, "for three successive weeks," and there were twenty-one days between the date of the notice and the day of sale, and there were nineteen days intervening between the first publication and the day of sale, and there were three publications of the notice, if it appears that no injury has resulted to either party, the deviation from a strict compliance with the order of publication will not be a sufficient cause for refusing to confirm the sale.

A chancellor has a large discretion in the approval or disapproval of sales made by a master, and a bidder acquires no independent right to the property, but his purchase depends upon the confirmation by the chancellor.

Exceptions to the proceedings of a master in the sale of property, taken ten years after the approval and confirmation of his acts, come too late, unless it is made to appear that positive injury has resulted.

If it appears that the purchasers under a sale, and the commissioner who conducted it, used means to prevent bidding, the sale would be set aside. But such a state of case should be shown to have existed, before the court will act.

In order to set aside a sale because of inadequacy of price, a case of sacrifice must be made out to justify the setting aside of a sale.

While several distinct tracts of land should not be offered for sale in block, yet an officer is not, unless required, bound to divide a tract of land into smaller parcels than any previously indicated, and offer them for sale.

ON the 14th of Sept., 1840, Garrett and wife made a mortgage to Moss on the south-east quarter of Sec. 5, 8 N., 8 E., for

$1,000, due at one year, with twelve per cent. interest. At May term, 1843, a decree of foreclosure was rendered in favor of Moss by default, the money, $1,326.66, found due upon the mortgage, to be paid in ten days, or the mortgaged premises to be sold after being advertised three successive weeks. H. O. Merriman, one of the complainant's counsel, was appointed commissioner to make the sale.

On the 8th day of February, 1841, Garrett and wife made another mortgage to Pettingill and Bartlett, for $510, with ten per cent. interest. At the same May term, 1843, a decree of foreclosure was rendered in their favor, for $629.10, with the same order of sale as made in the case of Moss, and William Mitchell appointed commissioner to make the sale.

The decrees were rendered on the 5th day of June, 1843, and the sales were made July 10th, 1843.

The notices were published for three weeks successively, as appears by the reports of the commissioners.

Before the time of sale, Moss agreed with Pettingill & Bartlett, that he would bid the amount due on his mortgage on that part of the tract, about eighty acres, lying south of the Farmington road, and to release the residue from his mortgage.

This agreement was reduced to writing, and is as follows :

AGREEMENT, Made and entered into this first day of June, A. D. 1843, between William S. Moss, of the one part, and Moses Pettengill and Amos P. Bartlett, of the other part, witnesseth, that whereas the said Moss has commenced a suit against Augustus O. Garrett, Moses Pettingill and Amos P. Bartlett and others, in the Peoria County Circuit Court of the State of Illinois, for the foreclosure of a mortgage held by the said Moss, given to him by the said Augustus O. and Mary Garrett, on the south-east quarter of section number five, in township number eight north, range number eight east of the fourth principal meridian, to secure the payment of one thousand dollars and interest, as is alleged by said Moss in his bill filed in said suit, which suit is now pending and undetermined in said court. Now it is agreed by the said Moss, that in consideration that the said Moses Pettingill and Amos P. Bartlett will make no defense to the rendition of a judgment of foreclosure in said suit at this term of said court, and the making of a decree by said court, ordering so much of said land to be sold as will satisfy the mortgage of said Moss, and so much of the remainder to be sold as will satisfy a mortgage on the same premises, held by said Pettingill and Bartlett, executed to them by the said Augustus O. and Mary Garrett, that then on the sale of said land under the decree of said court to be rendered in said suit, the said Moss will bid the amount of his said mortgage on that part of the said mortgaged premises lying south of the Peoria and Farmington road, running through the said land from east to west near the centre of said quarter section, and will release the remainder of said land from any incumbrance or claim held by him on the same by reason of the said mortgage to him, or by reason of said judgment of foreclosure. Witness my hand and seal affixed the day and year first above written.

WM. S. MOSS. [SEAL.]

The quantity sold was one hundred and thirty-five acres. Moss bought the part south of the Farmington road for $1,327.43, and Pettingill and Bartlett the residue for $632.67, being $14.51 per acre.

The original bill was filed Oct. 19, 1847, four years and three months after the sales under the decrees, seeking to set aside the sales solely upon the ground of a fraudulent combination and conspiracy between Moss, Pettingill and Bartlett, and H. O. Merriman, one of the commissioners, to prevent bidders from attending the sale, and that the land was sold for less than its value.

In this bill no claim was made or set up, that the land was susceptible of a better division than was made, or that it ought to have been subdivided and sold in smaller parcels, or that it had not been advertised according to the order of the court.

Moss filed his answer and amended answer to the original bill, and in the latter set up and asserted another title to the lands, acquired through Ballance, who purchased the same at sheriff's sale, upon executions against Garrett and others, issued against them upon judgments obtained against them as securities of Bryant, late sheriff of Peoria county.

Garrett then filed a supplemental bill, setting out the record judgment and proceedings under which Moss's new title was acquired, alleging that such sale was also fraudulent and void, because the land in controversy, with other lands, were sold en masse, and below their value, and praying also that the same might be set aside.

It was not until July 31, 1854, more than seven years after the filing of the original bill, that it was discovered that the land, at the time of sale, ought to have been put up in smaller lots, or that the sale had not been advertised according to law. At this time an amended bill was filed, setting up these pretended facts.

The amended answer of Moss was filed June 9th, 1848.

This answer sets up the further facts, that after the sale to Moss on the foreclosure, Garrett should have the avails of the spring on the land, which was sold, and by Moss deeded to the "Peoria Water Company" for $250, which Garrett received; and also that Garrett might redeem from the sale in one year. Garrett received the $250 for the spring, in stock of the "Peoria Water Company."

After the death of Wm. Mitchell, a paper is found by his administrators, by which Pettingill and Bartlett give to Garrett thirty-five days time in which to redeem from their sale. This paper is dated July 10, 1843.

At the October term of the Circuit Court of Peoria county, Garrett applies to the court for an order setting aside the sale made under their decree, alleging and setting forth precisely the same causes therefor as are stated and set forth as grounds of relief in the plaintiff's original bill, filed in this cause. Affidavits were filed and evidence heard for and against said motion, and a decision made thereon overruling the same, and Garrett prayed an appeal to the Supreme Court, which was not prosecuted or perfected.

In the affidavits filed by Garrett upon this motion, he distinctly states and admits, that he had made the contract with Moss that he might redeem the premises in one year after the sale.

At April term, 1856, this cause having been submitted to the court at the October term, A. D. 1855, upon the bills, answers, replication, evidence, and exhibits and depositions on file, and the court being sufficiently advised in the premises, did order, adjudge and decree that the said complainant's bill be dismissed, and that the complainant pay the costs of this proceeding, and that execution issue therefor.

MERRIMAN & MANNING, and LANDER, for Plaintiff in Error.

N. H. PURPLE and C. BECKWITH, for Defendants in Error.

WALKER, J. It is urged that this decree should be reversed, and the order confirming the commissioners' reports be vacated, because Moss, who holds a senior mortgage, and Pettingill and Bartlett a junior mortgage, on these premises, agreed that the latter would make no defense to Moss's suit for a foreclosure, and that he would bid the amount of his mortgage on that portion of the premises south of the Peoria and Farmington road, and would release his mortgage to the remainder of the quarter section.

It is a well established doctrine, that any corrupt agreement amongst bidders, which prevents competition at a public sale, is a fraud upon the owner, for which a sale should be set aside. If this arrangement was for that purpose, and had that effect, then these sales should be vacated, and the property resold. Upon a careful examination of the agreement, we can only see, from its terms, that Moss agreed that if the junior mortgagees would interpose no defense to prevent his getting a decree of foreclosure, he would release a portion of the premises upon which he had the elder mortgage. To him it was desirable to prevent delay, to them to collect their debt without having to redeem from this prior incumbrance. To the debtor it could work no injury, as it subjected the land to sale in smaller lots,

of convenient size, which would insure a better price, and the payment of these debts, while, if sold under both decrees and the junior mortgagees had not been able to pay off the prior mortgage, they would not have bid, and after the property was sold the debt might not have been satisfied. There was no stipulation in this agreement· that neither party should bid, but Moss bound himself to bid the whole amount of his mortgage debt upon a portion of the property, and the other mortgagees were left perfectly free to bid more than that amount on that part, and left him free to do the same on the remainder. In the light in which we view this agreement, it was no more than a release, by the senior mortgagee, of a portion of the mortgaged premises, to the junior mortgagees. And it cannot be doubted that he has such right, and in doing so violates no principle of justice or equity.

It is again urged that the advertisements of the time, place and terms of these sales were not inserted the proper length of time. The notices were each inserted in the newspaper, first on the 21st of June, again on the 28th, and lastly on the 5th of July, and each bore date on the 19th of June, and the sale was made on the 10th of July. From the date of the notices till the day of sale there were twenty-one days; and from the date of the paper, in which they first appeared, there were nineteen days intervening before the sale. In the case of Pettingill and Bartlett's decree, it provides for the sale, etc., "after having given notice of the time of said sale by inserting an advertisement of the same, for three weeks successively, in the 'Peoria Democratic Press,' a newspaper printed and published in the town of Peoria, county of Peoria, State of Illinois." The decree in favor of Moss provides for the sale, etc., "after having advertised the same by putting up notices in three of the most public places in Peoria county, or by inserting such an advertisement for three successive weeks in the 'Peoria Democratic Press,' a newspaper printed and published in the town of Peoria, Peoria county, Illinois."

In cases of the foreclosure of mortgages without redemption, it has been the uniform practice of the court of equity, in this State, to decree a sale of the property, for the payment of the mortgage debt and other liens, and to pay the surplus, if any, to the mortgagor. This seems to be the practice in most of the States of the Union. And to effect a sale the court must impose the duty upon the master, or upon a commissioner appointed for that purpose. The court, when it decrees the sale, also fixes the terms and conditions upon which it shall be made, having reference to the interest of all the parties. It is also usual to fix a time within which the mortgagor may pay the debt and

prevent a sale. But the terms upon which the sale is to be made, are necessarily, to a great extent, discretionary with the court decreeing it. The master or commissioner is the agent of the court, and derives his authority to act from the decree, and should be required substantially to conform his acts to its conditions and terms.

But on an application to have the report of his proceedings, under the decree, confirmed, the court should not regard mere captious objections. Any slight deviation from the requirements of the decree, which has not resulted in injury to either party, should not be a cause for refusing to confirm the sale. And while it is not the practice to refuse biddings in this State, it is not to be doubted that the chancellor, as elsewhere, has a large discretion, limited only by sound equitable considerations, in the approval or disapproval of sales made by his master. The accepted bidder at a master's sale, acquires no independent right to have his purchase completed, but is nothing more than a preferred bidder, who proposes for the purchase of the property, depending upon the sound, equitable discretion of the chancellor for a confirmation of the sale by his ministerial agent. *Freeman* v. *Hunt*, 3 Dana R. 614; *Campbell* v. *Johnson*, 4 Dana R. 186; *Owen* v. *Owen*, 5 Humph. R. 355. In determining this discretion, a regard to the stability of judicial sales has necessarily a large influence. This policy has rejected here the practice of refusing the biddings on an offer of an advanced price. But a higher policy, that of maintaining the purity of decretal sales, and of preserving the public confidence in their entire fairness, must prevail over the policy of giving stability to them. And where there has been fraud, accident, mistake or unfairness in the sale, the chancellor should not hesitate to withhold his approval of the sale, by his commissioner.

In this case there was a sale on the day fixed by the notice, at the time and at the place fixed by it, and by the proper person. The notices were inserted three times, once in each successive week, on the same day of each week, and the last insertion some five days before the sale. And while the intention of the court may have been to require three full weeks from the first publication to the day of sale, it was not required in terms by the decree. The notices were returned and filed with the commissioner's report, and by its approval they were regarded as in compliance with the decree. And the complainant must have so regarded them at the time, and for many years afterwards. In resisting the confirmation of the sales, this was not noticed as an objection in his affidavit, and was not urged in this proceeding until he filed his amended bill, in February, 1854, ten years and nine months after these sales were

approved.  This objection is thus urged at such a length of time after the sale was confirmed, that, unless it be shown that positive injury resulted, the objection can have no weight to vacate these sales.  If the party had urged it promptly, upon the filing of the master's report, it might have been heard with more favor, but as the court has exercised its discretion in adopting this sale, and no positive injury is shown, we do not feel justified in reversing the decree, upon this objection.

It is again insisted that the decree should be reversed, because the purchasers under these sales and the commissioners used means to, and did prevent bidders from attending the sale.  If such were true, than it would amount to a fraud for which the sale should be set aside.  The evidence shows that Hotchkiss inquired of Bartlett and of Merriman whether they supposed the sale would be made, and they informed him that they supposed it would not.  And it also appears from the evidence, that complainant had promised to pay the money before the day of sale, and relying on that assurance they gave the opinion.  But he does not say that if he had attended the sale, he would have bid a greater or even a less sum than it was sold for.  He says that he had means for the purpose of purchasing property, that this property suited him, and he wanted to buy it if the price at the sale suited him, but had not made up his mind to bid until he saw how it went.  He was at the place of sale and left just before the biddings commenced, in consequence of some one informing him that there would probably be no sale.  Who this person was, he does not remember, and he is unable to connect it with any of the parties to the transaction.  This we think is not sufficient to establish fraud in keeping bidders from attending the sale.  And there is no evidence that any thing was said to others for the purpose.  And on the other hand it appears that Merriman notified persons that the sale was about to commence, and requested them to attend and bid.

It is again urged that there was such a sacrifice in the sale of the property, that the sale should be set aside and a re-sale ordered.  The evidence in regard to the value of this property, like all evidence of value depending upon the opinion of witnesses, is conflicting.  A number of witnesses give the opinion, that the property at the time of the sale was worth from twenty to one hundred and twenty-five dollars an acre.  Others again fixed the value at less than twenty.  And the evidence shows that lands adjoining this were about and after that time purchased for about the same price, and even much less than this.  Bryan sold eighty acres adjoining this tract and lying nearer the city, the year after this sale for ten dollars an acre.  Bradley, more than a year after, purchased the undivided half of an

adjoining quarter for sixteen dollars and sixty-six cents an acre, and in the spring of 1846, purchased the other half at the same price. He purchased in the spring of 1848 eighty acres of the north-west quarter of the same section, in which this land was situated, with thirty acres improved and in cultivation, for twelve dollars and fifty cents per acre. And Underhill sold land adjoining this, in 1843, at eight dollars per acre, worth about half the price of this.

A number of witnesses give their opinion that the land sold for its value. And Bartlett and Pettingill gave complainant thirty-five days to pay the money and get back his land. If sold at such a sacrifice, it is strange that he did not raise the money by the sale of a portion of the land or by mortgage, and · prevent its being lost. And if it was purchased at such a sacrifice, it is strange that they should sell it at an advance of only about one hundred dollars near a year after they became the owners. At the time of the sale there was an unsatisfied judgment against complainant and others as securities of Bryant, which was a lien on the premises, and the probability is, that had some effect in fixing the value of the land. When we take into consideration the great scarcity of money, that the property was then only valuable for farming purposes, and that no person could foresee the rapid growth of the city which has since taken place, it is not strange that it should have only sold at fourteen dollars and fifty-nine cents per acre. And in view of all the evidence of the case, while it is conflicting, we are not prepared to hold that there was such a sacrifice as would justify the reversal of the decree.

It is again urged that the land was susceptible of a more advantageous division than the one made, and the property should have been offered in smaller lots, and failing to do so, the sale should be set aside. It has been repeatedly held that it is erroneous to offer several distinct tracts together, because, when thus offered, the presumption is, that the price was by that means depressed, as it required more means to purchase the several tracts together, and cut off competition, and in cases of redemption, when sold separately it affords the debtor the means of redeeming a part, while he might be unable to redeem all. We have been referred to no authority, and we are aware of none, that requires a sheriff or commissioner to divide land, on his own motion, into small parcels for sale. Yet when required by the debtor to do so, and when it would not produce a loss on the property, we do not hesitate in saying he should so offer it. But in this case there does not appear to have been such a request by the complainant or any one else. He was required by the court to sell all, or so much as would pay the mortgage

debt. It directed no division unless the bids had run the price beyond the amount to be raised. And the evidence shows that it was then valuable for farming purposes only, and the reasonable probability is, that to have so divided it would have reduced instead of increasing the price.

This objection was not urged against the confirmation of the sale, and was not embraced in the original bill, from which it is inferrable that it was not regarded as any serious objection at the time the sale was made.

And whether we consider the evidence in the case in reference to these objections singly or collectively, we do not perceive that the allegations of the bill are sustained. And we are of the opinion that there was no error in the dismissal of the bill, and that the decree of the court below should be affirmed.

*Decree affirmed.*