Syllabus.

149 163
180 631
180 636
149 163
194 ⁵155

## LEWIS E. INGALLS

v.

## NATHANIEL ROWELL et al.

*Filed at Ottawa January 16, 1894.*

1. SALE AT AUCTION—*set aside for prevention of competition by purchaser.* Where a person desirous of purchasing property at auction, prevents others, by improper conduct, from bidding against him, and thus succeeds in purchasing the property at less than its fair market value, the sale will be set aside. So, agreements not to bid at a public auction are in general void, as against public policy, and as tending to fraud, and such agreements, at least when brought about or participated in by the purchaser, will vitiate the sale.

2. JUDICIAL SALE—*prevention of competition vitiates sale.* The greatest fairness is required of those intrusted by law to conduct judicial sales and of those who purchase at such sales, and any contract, agreement or arrangement entered into on the part of the bidders, calculated to stifle competition at the sale, is contrary to public policy, a fraud upon the law, and will vitiate the sale.

3. At an administrator's sale of land to pay debts, and during the bidding, two of the bidders, A and B, agreed that if either became the purchaser the other should have the option to take the land on paying the purchaser $200, so that they ceased to be competing bidders, and A induced another person to refrain from further bidding by an agreement to convey a part of the premises to him at the same price the whole land sold for, and induced others not to bid against him, and it appeared that the land sold for less than its fair market value, and A and B became the purchasers, but had the deed made to A on payment of $200 by the latter: *Held,* that the fraud in the prevention of competition at the sale vitiated the deed made to A.

4. Such a case is distinguishable from one where several persons desiring to obtain distinct portions of a tract about to be sold at auction, agree that one of their number shall bid for the benefit of all, and in case he succeeds in making the purchase shall divide the land according to their agreement, and also from a case where one is deputed to bid as the agent of another, with specific directions as to how, and how much, he shall bid. Such arrangements, entered into before the sale, are held to promote rather than to stifle competition.

5. LACHES—*in bringing suit to set aside sale for fraud.* Heirs of a deceased person seeking to set aside an administrator's sale on account

of the fraudulent practices of the purchaser in preventing competition at the sale, must act with promptness to have the same set aside after discovery of the fraud, and if they are guilty of improper delay in the assertion of their rights, courts of equity will not relieve them.

APPEAL from the Circuit Court of Will county; the Hon. CHARLES BLANCHARD, Judge, presiding.

Messrs. GARNSEY & KNOX, for the appellant.

Mr. EGBERT PHELPS, for the appellees.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by Nathaniel Rowell, Jacob H. Rowell, Annie E. Rowell, Laura E. Rowell and Sarah Genevieve Rowell, the children and heirs at law of Hopkins Rowell, deceased, to set aside and annul an administrator's sale of certain lands belonging to the estate of the decedent, made for the purpose of paying debts. It appears that Hopkins Rowell died intestate October 1, 1880, being the owner, at the time of his death, of two tracts of land lying near the city of Joliet, one containing about 154 acres, and subject to a mortgage of $4000 and interest, and the other containing 80 acres, and subject to a mortgage of $2000 and interest. An administrator having been appointed, claims against the estate largely exceeding the amount of the personal assets were presented and allowed. For the purpose of raising money to pay the deficiency, the administrator, on August 27, 1881, filed his petition for leave to sell the two tracts of land above mentioned, and on the 17th day of October following, a decree was entered ordering the administrator to sell the lands at public vendue, subject to the mortgages and to the widow's dower, for the purpose of paying debts. In pursuance of this decree, the administrator, on November 19, 1881, sold both tracts at public vendue, the 154 acre tract being struck off and sold to H. K. Stevens for $5023.70, and the conveyance

being made at his request to the defendant Ingalls, and the 80 acre tract being struck off and sold to the widow of the intestate for $7247.61, the entire amount thus realized from the sale being $12,271.31. The sales being reported to the court were duly approved, and conveyances were made to the purchasers in accordance therewith. The amount thus realized being applied to the satisfaction of the claims allowed, still left a deficiency of $3705.69, which, so far as appears, still remains unpaid.

The sale of the 154 acre tract is attacked by the bill on the ground of improper influences used by Ingalls upon those present at the sale and intending to become bidders, for the purpose of preventing competition at the sale and to prevent a fair sale, and to enable himself to purchase the property for less than its real value, and thereby defraud the complainants of their just rights. As alleged by the bill, those influences consisted of promises to some of the intending bidders to pay them, and afterwards actually paying them certain sums of money, to induce them to absent themselves from the sale, or not to bid thereat, or to refrain from bidding above a certain figure, or so high as to become actual competitors to him; that to other proposed bidders, he promised to sell such portions of the property as they might desire, or certain particular portions which they then desired and intended to purchase, in the event of his becoming the purchaser, at the same price at which he should bid off the same, on condition that they should not bid at the sale; that some of the bidders were thereby actually induced to and did absent themselves from the sale, and to refuse to become bidders, while others bid insignificant sums, and so talked and conducted themselves at the sale and in the hearing of those present, as to cheapen the lands in the opinion of the by-standers, and prevent any reasonable or fair bids thereon as against him, and that he was thereby enabled to and did purchase the land at less than its actual value, and less than it would have brought if the

sale had been unhampered and free from his fraudulent machinations and manipulations.

It appeared that ten and seventy-four hundredths acres of the land, being that portion of the tract lying north of the right of way of the Michigan Central Railroad Company, had been sold by Ingalls at the same price at which he purchased it, and had passed into the hands of an innocent purchaser, and the bill was therefore so amended as not to seek to have the sale set aside as to that portion of the tract. The defendant answered denying the equities of the bill, and a replication being filed, the cause was heard on pleadings and proofs, and upon such hearing, it was found that the material allegations of the bill were fully proven, and a decree was entered declaring the administrator's sale to Ingalls, except as to the portion north of the railroad, to be null and void and cancelling the same, and the cause was referred to the master to state the account between the complainants and defendant, the master being directed, in stating the account, to credit Ingalls with the amount of his bid, and all moneys paid by him for taxes, necessary repairs, and incumbrances on the land, and other reasonable and proper expenses on account thereof, and interest on the sums paid at the rate of six per cent per annum, and charge him with all moneys received from the sale of any portion of the land, and for the rents, issues and profits of the land, including profits derived from taking or selling material or products therefrom. From this decree, Ingalls has appealed to this court.

The questions presented by the appeal are primarily and chiefly questions of fact. H. S. Carpenter, who was a member of the Joliet Elevator Company, testifies that he went to the sale to bid on the property, because there was a piece of it lying north of the Michigan Central Railroad, close to the elevator property, which the Elevator Company desired to obtain; that his orders were to buy the land north of the railroad if he had to pay $200 or $300 an acre for it, and that

he went to the sale for the purpose of getting it if possible; that he went there to bid on the whole property; that along between twelve and one o'clock, Ingalls came to witness, the property then standing on witness' bid, and said to witness: "Do you care anything about it if you get what is north of the railroad?" to which witness replied that he was not very particular about it. "Well," said Ingalls, "if I get this property, you may have what there is north of the railroad for just what I pay for the whole farm." Witness then concluded that it was safe to risk getting the land north of the railroad on Ingalls' promise, and went off about his business, and subsequently got the land from Ingalls, by paying him for it at the same rate per acre which he had to pay for the whole tract.

Ingalls' account of the matter is somewhat different. He testifies that in the morning, Woodruff, the president of the Elevator Company, came to him and wanted to know if he, the witness, wanted the part of the land north of the railroad; that witness told him that he cared nothing in particular about it; that Woodruff wanted to know if witness would let him have it if he got the whole farm; that witness told him he would, and afterwards Carpenter and Woodruff came back and wanted to know at what price, and witness told them that they might have it at the same price he paid for the whole; that Carpenter was present at the sale and was a bidder. He fails to state, however, whether this arrangement between him and Carpenter and Woodruff was made before or during the sale, or whether Carpenter continued to bid after it was made.

But it is sufficient to say, in relation to whatever discrepancy there may be in the evidence on this point, that the witnesses were examined in open court, thus giving the judge of the court below an opportunity to see them and hear them testify. His means of judging of their relative fairness and credibility were therefore so far superior to ours, that we would not be justified in disturbing the findings of the court below as to the facts, unless satisfied that they are clearly against the

preponderance of the evidence.    Here there is nothing upon which we could base such conclusion, and we must therefore accept as conclusive the finding of the court below that the account of the transaction given by Carpenter is the true one.

Again, James R. Ashley testifies that he was at the sale and was bidding on the property; that Ingalls came to him and asked him whether he wanted the farm, to which the witness replied, in substance, that he would not be bidding on it unless he wanted it or expected to take it if he got it; that Ingalls replied: "I think the farm is run up all it is worth, and if you don't particularly want it, I should like it very well myself; perhaps I can do you a favor some time." The witness soon after left the sale, and was not present when the land was struck off.

The evidence also tends to show that H. K. Stevens was present at the sale and a bidder for the farm; that while the sale was in progress, Ingalls entered into an agreement with Stevens, that whichever of the two had the farm struck off to him, the other should have an option to take it off his hands, by paying him a bonus of $200; that the land was finally struck off to Stevens, and that, in pursuance of the agreement, Ingalls paid Stevens $200, and by direction of Stevens, the conveyance was made by the administrator to Ingalls. That such an agreement was entered into during the sale and afterwards carried out is not denied, the only controversy being, as to whether it was first proposed by Ingalls or Stevens. Ingalls testifies in relation to it that during the day, Stevens came to him and said: "If you get that (the land in question), will you give me an option to take it at $200?" that witness replied: "Yes, I will, if you will give me an option for the same."

There is some controversy as to whether the price at which the land in question was bid off was less than its fair market value, but after a careful examination of the evidence, we are of the opinion that the court below was justified in finding, as

it did, that Ingalls in fact purchased the land at less than its fair market value, and at less than it would have brought if fair competition had not been prevented.

It is a well recognized rule, that where a person, desirous of purchasing property at auction, prevents others, by his improper conduct, from bidding against him, and thus succeeds in purchasing the property at less than its fair market value, the sale will be set aside. So, agreements not to bid at a public auction are in general void, as against public policy, and tending to fraud, and such agreements, at least when brought about or participated in by the purchaser, will vitiate the sale. See Am. & Eng. Encyc. of Law, 997, and authorities cited. As said in *Wilson* v. *Kellogg*, 77 Ill. 47: "The law may be regarded as well settled, that the greatest fairness is required of those intrusted by law to conduct judicial sales, and of those who purchase at such sales; and any agreement, contract or arrangement entered into, on the part of the bidders, calculated to stifle competition at the sale, is contrary to public policy, a fraud upon the law, and would vitiate the sale." See also, *Lloyd* v. *Malone*, 23 Ill. 43.

It requires no argument to show that the conduct of Ingalls, as disclosed by the evidence, had a direct tendency to stifle and prevent competition at the sale, and we think it a fair inference from all the evidence that it did in fact have that effect. It should be noticed that the influences used by him were all brought to bear while the sale was in progress, and upon persons who were present as bidders and were actually bidding. The case is clearly distinguishable from those where several persons desiring to obtain distinct portions of a tract of land about to be sold at auction, agree that one of their number shall bid for the benefit of all, and in case he succeeds in making the purchase, shall divide the land according to their agreement. It is also distinguishable from those cases where one is deputed to bid as the agent of another, with specific directions as to how and how much he shall bid.

Arrangements of this kind, entered into before the sale, are held to promote rather than stifle competition. Such however was not the case here. Carpenter was in attendance at the sale as a bidder, representing a competing purchaser, and he was prepared to and intended to bid a sum considerably larger than that bid by Ingalls or Stevens. His instructions were to secure the tract lying north of the railroad, even if it cost $200 or $300 per acre, and as that was not offered for sale separately, the only way open for him to secure that tract was by purchasing the entire farm. He testifies that he regarded the residue of the farm worth from $65 to $70 per acre for speculation, the price at which the whole farm was sold being a little less than $62 per acre. Under the circumstances, it can not be doubted that Carpenter was prepared to and would have bid for the entire tract a sum considerably in excess of that at which it was struck off rather than fail to secure the tract north of the railroad. He doubtless satisfied himself that his chances of securing the desired tract by means of his arrangement with Ingalls were quite as good as by continuing to bid further, and he immediately dropped out of the list of competitors.

Much the same may be said of Ingalls' influence over Ashley. He was a bidder, and so far as the record furnishes us with any satisfactory information, was bidding in good faith, and with the expectation of taking and paying for the land, in case it should be struck off to him. The evidence does not show how much he intended to bid, nor is there anything tending to show that he had reached his ultimate bid, or that his competition was at an end. Under these circumstances, he was approached by Ingalls, who expressed the opinion that the land had already been run up as far as its value would warrant, and after saying that he would be glad to purchase it, intimated to Ashley that if he would cease to bid, he, Ingalls, would be willing to reciprocate by doing him some

favor in the future. By this means, Ashley was induced to quit bidding and leave the sale before the land was struck off.

The arrangement between Ingalls and Stevens involves somewhat different principles, but leads to the same result. They were both bidders, and were bidding in competition, and so continued until the bidding had proceeded to a considerable length. The practical result of the agreement between them was, that each ceased to be a competitor of the other. Under that agreement, if either desired to secure the land for himself, his only sure way was not to bid against the other, but to let it be struck off to him, and then exercise his option of paying $200 and taking the property off his hands. As against all other bidders, the two, from that time forth, stood as one bidder, the competition of the other being wholly withdrawn. It is manifest that such an arrangement had a direct tendency to stifle competition, and that such was both its intention and effect there can be no doubt.

We have carefully considered the various decisions cited on behalf of the appellant, but fail to find in them any rule not in harmony with that already stated. We are clearly of the opinion that the facts appearing from the evidence and found by the decree, are amply sufficient to warrant the court in setting aside and vacating the sale and deed to Ingalls, unless the complainants have lost their right to have them vacated by their *laches.*

It is doubtless the rule that parties seeking to avoid a sale of property on account of fraudulent practices of the purchaser, must act with promptness after discovering the fraud, and if they are guilty of improper delay in the assertion of their rights, courts of equity will not relieve them. In this case, the sale was made November 19, 1881, and the bill to set it aside was not filed until June 8, 1887. The bill alleges, by way of meeting the defense of *laches,* that the complainants were not aware of the fraudulent conduct of Ingalls at

the time, and did not become aware of it until about the 1st day of June, 1887, and that Sarah Genevieve Rowell, one of the complainants at the time of the sale, and for several years thereafter, was a minor of tender age.

It appears from the evidence that Nathaniel Rowell, at the time of the sale, was living in the city of Washington, and that he continued to live there until the year 1885 or 1886, when he returned to Joliet and thereafter had partial charge of the property for his sisters and mother. James H. Rowell seems to have been living in Minnesota, and not to have moved back to Illinois until after the bill was filed. Of the three sisters, two were invalids, and the third was, until a year or two before the filing of the bill, a minor, and the three were living with their mother in this State. Nathaniel Rowell testifies that the first information that came to any of the complainants that there had been anything wrong at the administrator's sale, was communicated to the witness by a third person named, about one week before the bill was filed, and that he then ordered it filed; that neither he nor his family had any knowledge before that time of the transactions set forth in the bill. As no evidence was offered tending affirmatively to charge any of the complainants with notice of the alleged fraudulent acts of Ingalls at the sale prior to the date fixed by this witness, we think his testimony, taken in connection with circumstances of the case as shown, is sufficient to prove, *prima facie*, that none of the complainants had notice of the alleged frauds until a few days prior to the filing of the bill, and this being so, the complainants can not be said to have been guilty of *laches*.

We are of the opinion that the decree is supported by the evidence, and it will accordingly be affirmed.

*Decree affirmed.*