A. B. Mansfield *et al.*

*v.*

W. O. Wallace *et al.*

*Opinion filed October 24, 1905.*

1. Judicial sales—*an attorney purchasing at client's sale must prove good faith.* An attorney who purchases property for himself at a sale under a partition proceeding conducted by him as solicitor and counsel for the complainants, has the burden of proving that he acted with the utmost fairness to his clients when the sale is attacked by them.

2. Same—*what conduct of attorney will overthrow sale to himself.* A sale, under a partition decree, to the solicitor who conducted the suit will not be upheld, where it appears that he so beclouded the records by failing to make lienholders, including himself, parties to the proceeding that persons other than himself, by reason of the concealment of the real condition of the title, were unable to bid intelligently at the sale.

3. Same—*when conduct of master will vitiate sale.* A court of equity will not uphold a partition sale where the evidence shows that the master accepted as cash certain notes and mortgages held by the purchasers against the property and reported it as cash to the court, and where, shortly after the sale, a certain tract of the land was deeded by the purchasers to the master's wife.

4. Same—*persons conducting sale must realize as much as possible therefrom.* The fact that a decree provides that the property

shall not be sold for less than two-thirds of its appraised value does not make it any less the duty of the officer or the attorney conducting the proceedings to realize as much more than two-thirds of the appraised value as possible.

5. SAME—*successful attempt by an attorney to prevent bidding vitiates sale to himself.* A sale of land, under a partition decree, to the attorney who conducted the proceeding will be set aside where it is shown that he successfully deterred others from bidding and procured the property for himself at an inadequate consideration.

6. SAME—*a master has no right to fix liens after partition sale.* In a partition proceeding it is the province of the chancellor to determine the liens upon the property, and the master in chancery who conducted the sale has no power to fix them after the sale without any finding by the court in regard thereto.

7. SAME—*fact that notices of sale were not posted is a circumstance showing bad faith.* The fact that notices of the sale required by the partition decree to be posted in addition to the published notice were not in fact posted, is a circumstance to be considered in determining whether the conduct of the master and of the attorney conducting the proceeding was such as to justify upholding the sale, at which the attorney himself was the purchaser.

8. SAME—*effect where third person joins with attorney in purchasing at sale.* A third person who joins with an attorney in purchasing property at a sale under a partition proceeding which he knows was conducted by the attorney places himself under the same rules as those governing the attorney, and has the burden of showing that the transaction was just and fair.

9. SAME—*when laches cannot be imputed.* Laches cannot be imputed to one seeking to set aside a judicial sale upon the ground of fraud, actual or constructive, until after his knowledge of the facts or of circumstances sufficient to have put him upon inquiry which would have led to such knowledge.

10. SOLICITORS' FEES—*when fee cannot be apportioned.* The solicitor's fee cannot be apportioned in partition, where the solicitor, instead of correctly setting forth the rights and interests of the parties in the bill, purposely omitted necessary parties holding liens on the property.

WRIT OF ERROR to the Circuit Court of Shelby county; the Hon. TRUMAN E. AMES, Judge, presiding.

This is a bill in chancery, filed on October 10, 1903, by the plaintiffs in error, Aaron B. Mansfield, Freeman Mansfield, David Nanney, Frank M. Shannon, Minnie E. Dush,

Wilmay Torrence, Iva Brewer, Zimroad M. Elder, Sarah McMillen, George E. Shannon, Rachel Clark, Emaline Warren, William W. Mansfield, Bertha McGowan, Fenton Mansfield, Della Curlin, Sarah Riggs, Inez E. Shannon, A. Grover Shannon, Alen Presseler, Matty Wilcox and Sallie Popple, (the last three of whom were the heirs of Emily Presseler one of the defendants to the original bill who has since died), against the defendants in error William O. Wallace, John A. Tackett, Jacob Mansfield, John W. Yantis, W. E. Walker, Douglas Frailey, George A. A. Dieckmann, Martha Gubser, Ross R. Mattis and William R. Liston. The bill was subsequently amended in various particulars, and by making Jacob Mansfield a party complainant, instead of a party defendant. The object of the bill is to set aside a sale, made under a decree in a partition proceeding theretofore had and prosecuted to decree and sale. The charge in the bill is that the defendant in error, William O. Wallace, was the solicitor for the complainants in the original partition proceeding, and also undertook to act for and represent the interests of all the other owners of undivided interests in the property besides the complainants, and that, at the original partition sale, he purchased the property for himself, and for one John A. Tackett who was associated with him; that he violated his duty as attorney and obtained the property for himself, and in doing so was guilty of various acts of actual and constructive fraud, such as would justify a court of equity in setting aside the sale, and the deed or deeds executed in pursuance thereof, and all the other proceedings had thereunder. The prayer of the bill is that, upon a hearing, the report of the commissioners in the original partition proceeding be set aside and held for naught, and that new commissioners be appointed to partition the premises, and appraise the same, in case they cannot be partitioned and divided without manifest injury to the parties interested in the same; that the said pretended sale, made by the master in the original partition proceeding, be decreed to be void

and of no effect, and that the premises be sold under the direction of the court; that, by reason of the betrayal of the trust of the said Wallace, a fee of $1200.00, allowed to him, be ordered to be refunded, and that an accounting be had of the rents, issues and profits of the premises, so held since the pretended sale to Wallace and Tackett and Yantis, for the use and benefit of the parties interested in the premises; and that the deed from the master to Wallace and Tackett, and the deed to Yantis, be canceled. The bill, as finally amended, charges that the execution and delivery of the deed by the master to Wallace and Tackett constitute in equity a mortgage in favor of Wallace and Tackett and against the owners of the premises, and, as such, secure to Wallace and Tackett the amount of money actually paid by them to the master with five per cent interest; that upon said mortgage the owners of the premises are entitled as credits to the proceeds derived from the sale of any part of the premises, conveyed by Wallace and Tackett to innocent purchasers without notice, as well as the rents, issues and profits received by Wallace and Tackett, less the taxes paid and improvements made, if any, by them, which amount, less said credits upon said accounting, the complainants offer to pay to Wallace and Tackett; that the premises are now held by Wallace and Tackett as trustees; that the defendants have no interest therein save as equitable mortgagees, and that an account be taken, and that Wallace and Tackett be charged with the rents, issues and profits, and the reasonable value of any parcel of the premises sold by them; that, upon the stating of said account, the amount, if any, which may be found to be due to Wallace and Tackett be decreed by this court to be secured by such equitable mortgage, and, if they have from the rents, etc., received an amount sufficient to pay such amount as may be found due them, then said mortgage may be canceled, and, if the amount so received by them be in excess of the amount so found to be due to them, then that they be decreed to pay over such excess to the master,

and that the proceeds thereof be brought into court to be distributed under the direction of this court.

All the proceedings in the original partition suit and the records and papers in said suit, as well as other documentary evidence and oral testimony, were produced before the court upon the hearing of the cause. The circuit court entered a decree dismissing the bill for want of equity, to which the complainants below, the present plaintiffs in error, excepted, and have prosecuted this writ of error for the purpose of reviewing such decree of dismissal.

The material facts are as follows: One John B. Mansfield of Shelby county, Illinois, died intestate on February 5, 1901, leaving no widow or child or children, or descendants of such, and leaving him surviving, as his only heirs-at-law, eleven brothers and sisters and ten nephews and nieces, all of whom, with the exception of Emily Presseler who has since died, are plaintiffs in error herein. At the time of his death John B. Mansfield owned 724 acres of land in Fayette county, 60 acres in Shelby county, and 120 acres in Jackson county, besides some town lots and blocks in the city of Cowden in Shelby county.

The original bill for partition was filed on April 17, 1901, a little more than two months after the death of John B. Mansfield, by Jacob Mansfield and Freeman Mansfield, two brothers of the deceased, as complainants, through William O. Wallace as their solicitor, and the other heirs were made defendants to the bill; and the bill set forth the interests of the parties in the premises, and alleged that Sarah Shellenberger, Ross R. Mattis, Wiliam H. Craig, George A. A. Dieckmann, Douglas F. Frailey, Martha Gubser, Louis L. Lehman, and the Ætna Life Insurance Company claim some interest in said premises. The bill also alleged that the defendants, A. Grover Shannon and Inez E. Shannon, were minors under age. The bill prayed for the appointment of a guardian *ad litem,* for the minors, for partition and division of the property, or, in case the same could not

be divided, for a sale of the same. The guardian *ad litem* filed answers for the minors on June 4, 1901. George A. A. Dieckmann filed an answer to the bill for partition, alleging that he held a mortgage upon a part of the premises to secure $1500.00, and filed a cross-bill on June 3, 1901, for the foreclosure of his mortgage, to which cross-bill an answer was filed for the minors by their guardian *ad litem* on June 4, 1901. Mattis also filed an answer to the bill for partition, alleging that he held a mortgage on the premises to secure a note for $1300.00 and interest and attorneys' fees. None of the defendants, who were heirs of the deceased John B. Mansfield, except the two minor defendants, answered the bill for partition, and defaults were taken against all the adult heirs, who were defendants to the original bill.

The cause was referred to a master in chancery, who found the facts in regard to the death of John B. Mansfield and the heirship of the parties named; that the said John B. Mansfield had executed a bond for a deed to Douglas F. Frailey in his lifetime for 120 acres of land situated in Fayette county; that certain premises in Fayette county had been sold by one Hunold to Sarah Shellenberger, and subsequently conveyed to John B. Mansfield.

A decree for partition and appointment of commissioners was entered on June 4, 1901, which finds that John B. Mansfield executed the bond for a deed to Douglas F. Frailey, and that the Ætna Life Insurance Company held a mortgage upon the property, sold to Shellenberger, whose interest in the same had been forfeited; that on May 15, 1899, the deceased executed a note and mortgage to Dieckmann, upon which there was then due $1657.33, and costs, and $100.00 solicitor's fees; that on April 1, 1898, he executed a mortgage or trust deed to Mattis to secure $1300.00; that on June 25, 1900, the deceased and Frailey executed two notes to Martha Gubser for $350.00 each, and to secure the same mortgaged the premises, included in the bond for a deed

executed by the deceased to Frailey; that Margaret Gubser
owns said notes, upon which there is now due $700.00, and
interest from June 25, 1900; that the rights of Frailey un-
der said bond have been forfeited, and that the same should
be canceled as a cloud upon the title. The decree of partition
found that the interests of Frailey and Shellenberger had
been forfeited, and that Mattis and Dieckmann and Gubser
held mortgages upon portions of the property, specifically
describing the same; that each of eleven brothers and sisters
of the deceased John B. Mansfield was entitled to one-twelfth
of the premises in question in fee simple, and that certain
nephews and nieces were entitled to the other one-twelfth
thereof.

The commissioners reported that the premises were not
susceptible of division and appraised the total value of the
same at $19,020.00, valuing the property in Shelby county,
including the lots and blocks, at $1850.00; that in Fayette,
county at $16,330.00, and that in Jackson county at $840.00,
including the 120 acres in Fayette county, sold by the de-
ceased to Frailey, which was appraised at $2600.00. The
report of the commissioners was filed on June 10, 1901, and
on June 11, 1901, a decree of sale was entered, which di-
rected that all the premises in the three counties named "be
sold at public auction at the south door of the court house
in the city of Shelbyville, in the county of Shelby and State
of Illinois, to the highest and best bidder, free and clear of
all mortgage liens of every nature and kind; all of said
mortgages, liens and indebtedness to be paid out of the pur-
chase price or assumed by the purchaser; and when such
mortgage indebtedness is assumed by the purchaser, such
amount as is assumed shall be considered as so much paid
on the purchase price—and the bids on each piece or parcel
shall (be) equal to at least two-thirds of the valuation put
upon the same, as shown by the reports of the several sets
of commissioners heretofore appointed by the court to make
partition thereof; such valuation having been made as

though no mortgage indebtedness existed, unless the other pieces will at the same time sell for enough to make the total amount of the sale equal to two-thirds the total amount of the valuation of all the premises to be sold; which said sale shall be made on the following terms, namely: one-half in cash on the day of sale; the other one-half in one year from the date of sale; the deferred payment to be secured by personal security and mortgage on the premises sold; the said deferred payment to draw interest at the rate of five per cent per annum until paid; that the said master in chancery of this court, John W. Yantis, be and is hereby directed to make said sale, and to carry into effect this decree; that the said master will first give public notice of such sale and the time and place thereof, by publication in the *Shelby County Leader,* a weekly newspaper published in the said county, for at least four successive weeks prior to said sale, and by posting written or printed notices thereof in at least five of the most public places in each (of) the said county of Jackson, the county of Fayette, and the county of Shelby, where said premises are situated; and, upon the confirmation of the report of the said master, he shall execute and deliver to the purchaser or purchasers of the premises so sold a proper deed or deeds of conveyance thereof; the said master will bring the money realized from such sale into court to be distributed to the parties entitled thereto under the direction of the court; and out of the money realized from said sale the said master will pay all the costs of this proceeding." The decree found that "W. O. Wallace is entitled to a solicitor's fee herein of $1200.00."

The master published a notice of sale to the following effect: "Public notice is hereby given that, in pursuance of a decretal order entered in the above entitled cause in said court on the 11th day of June, A. D. 1901, I, John W. Yantis, master in chancery of said court, on the 19th day of June, A. D. 1901, at ten o'clock in the forenoon of said day, have sold (will sell,) at public auction at the south door

of the court house in said city of Shelbyville, and county of Shelby and State of Illinois, the following described real estate," describing the several pieces of property in the three counties, and giving the appraised valuations thereof. The notice then states the terms of sale as follows: "The purchaser to pay one-half of the purchase money down on the day of the sale, and the balance in one year, with interest at the rate of five per cent per annum, secured with personal security and a mortgage on the premises so sold. No bid will be received unless it is equal to two-thirds of the appraised value as above set forth."

On June 20, 1901, one William R. Liston filed a petition, setting up that he was the owner of the premises above described as having been sold by Hunold to Shellenberger, and asking that the ownership of the same be vested in him. On June 21, 1901, the court entered an order that there be no sale of said last named premises until the rights of said Liston should be heard and determined. On July 27, 1901, the master filed his report of sale in which he states as follows: "The undersigned master in chancery of said court * * * respectfully reports that at the request of the complainant I proceeded to advertise the lands and premises described in said decree, as therein directed, by causing a notice containing the time, terms and place of sale, and a particular description of the premises to be sold, to be inserted for four successive weeks previous to the day of sale, in the *Shelby County Leader*, a newspaper published weekly in the city of Shelbyville, in said Shelby county, a copy of which notice, with the certificate of publication thereof, is hereto attached, and also by causing similar notices to be posted in five of the most public places in said county for the same length of time, and on Friday, the 19th day of July, A. D. 1901, at ten o'clock A. M., at the south door of the court house in Shelbyville in said Shelby county, I offered the said premises for sale at public vendue to the highest bidder on the terms prescribed by said decree, and the same

were struck off and sold as follows:" ·(Here follows a description of all the property, including the 904 acres in the three counties, and the lots and blocks); and the report of sale then proceeds as follows: "The same was sold to W. O. Wallace and John A. Tackett, they being the highest bidders; the total amount of said sale being the sum of $11,520.00, and being more than two-thirds of the appraised value of said premises; the said purchasers having paid me the one-half of said bids in cash, and executed notes and mortgages for the deferred payments, according to the terms and conditions of said decree, and said cash payment amounting in all to the sum of $5760.00; out of said cash payments I have paid the costs and charges of said suit and sale, being the sum of $1979.48, including attorney's fees allowed by the court, and bring into court for distribution under order of the court the sum of $3780.52." On November 25, 1901, Wallace and Tackett filed an intervening petition, stating that since said sale they had discovered that the Laborers' Loan Association of Shelbyville, was the owner of certain lots in Cowden in Shelby county, which had been sold by the association to other parties; that petitioners had paid for the same $433.97, and praying that they be allowed a credit to that amount, $216.98 on their note for the deferred payment, and $216.98 on their cash payment. In other words, praying for a rebate on their bid of $433.97. An intervening petition was also filed by Walker, the administrator, alleging the resignation of Graham, the former administrator, stating that certain claims had been allowed in the probate court, and asking that the master be required to pay over to the administrator the proceeds of the sale, if any should be left after paying off the mortgages, to apply on the claims probated against the estate.

On November 25, 1901, the court rendered a decree confirming the sale of the master, reciting "that the said master, John W. Yantis, has, in every respect, proceeded in due form of law and in accordance with the terms of said

decree, and that said sale was fairly made; and  *  *  *
that the proceeding, sale and report of said master, John W.
Yantis, be and the same are hereby approved and confirmed;
and it is further ordered that the said master  *  *  *  exe-
cute and deliver to the said John A. Tackett and William O.
Wallace, the purchasers at said sale, proper conveyances of
the premises so sold," etc.   The decree allowed to the pur-
chasers the credit theretofore prayed for of $433.97.   A de-
cree was also entered granting the prayer of the intervening
petition of Liston.

BRAZ D. TULL, ROBERT M. PEADRO, and GEORGE B.
RHOADS, for plaintiffs in error.

W. C. KELLEY, RICHARDSON & WHITAKER, and WIL-
LIAM H. RAGAN, for defendants in error:

Public policy requires that there shall be stability in ju-
dicial sales.   *Conover* v. *Musgrave,* 68 Ill. 58;   *Quigley* v.
*Breckenridge,* 180 id. 627.

A court of equity will not permit a judicial sale to be set
aside for fraud without clear and satisfactory proof.   *Wilson*
v. *Kellogg,* 77 Ill. 47.

In this State there is no rule of law which prohibits an
attorney in a cause from becoming a purchaser at a mas-
ter's sale under the decree therein of land belonging to his
clients, provided strict fairness is observed.   *Hess* v. *Voss,*
52 Ill. 472;   *Laclede Bank* v. *Keeler,* 109 id. 385;   *Herr* v.
*Payson,* 157 id. 244.

The presumption is, that the court had sufficient evidence
to warrant the decree confirming the master's report of sale,
nor is it necessary that evidence should be preserved in the
record.   *Moore* v. *Titman,* 33 Ill. 358;   *Dow* v. *Seely,* 29
id. 495.

The only mode of taking advantage as to failure of mas-
ter to advertise the sale of the property is by excepting to
the report of sale.   *Dow* v. *Seely,* 29 Ill. 495.

The plaintiffs in error, by failing to except to the master's report of sale in the partition proceedings, waived all objections to the report. They had their day in court when the decree confirming the report of sale was rendered. *Ward* v. *Ward,* 174 Ill. 432; *McCracken* v. *Droit,* 108 id. 428.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—It will be seen, by reference to the statement of facts preceding this opinion, that the defendant in error, William O. Wallace, was the solicitor of the two complainants in the original partition suit, to-wit, Jacob Mansfield and Freeman Mansfield. The other heirs of John B. Mansfield were not represented upon the face of the record by any solicitor, but Wallace admits in his answer that the relation of attorney and client existed between him and the owners of the premises in question, and that it was his duty to protect the interests of all the parties to the partition proceeding. He says in his answer: "Respondent further answering says that it is true that he was solicitor for the complainants in said cause; and he also admits that, by reason of the prosecution of the said partition suit, he was allowed by this court a solicitor's fee of $1200.00, and that the said fee was paid by the interested parties in said suit in proportion to their respective interests in said land, as fixed and determined by the decree of this court; respondent further answering admits that, by reason of the relation of attorney and client existing by and between this respondent and the joint owners of said premises, it became and was the duty of respondent to protect the interests of each and all of the said parties to said proceedings, as charged in said amended bill." It also appears from the statement of facts that he was the purchaser, together with one John A. Tackett, of the whole of the premises at the nominal sum of $11,520.00, although they were appraised by the commissioners at something over $16,000.00, after taking out certain

pieces of property, which belonged to other parties than the deceased intestate. As Wallace was solicitor and counsel for the owners of the property, and conducted the partition proceeding as their solicitor and counsel, he must show that as purchaser he acted with the utmost fairness towards his clients.

Where the relation of attorney and client thus exists, and the attorney becomes the purchaser of his client's property, the law watches over the transaction with a jealous eye, and will often declare it void when, as between other persons, it would be unobjectionable. It does not so much consider the bearing of this doctrine upon particular cases, "as it does the importance of preventing a general public mischief." "It is not necessary to establish that there has been fraud or imposition upon the client; * * * but the burden of establishing its perfect fairness, adequacy and equity is thrown upon the attorney, upon the general rule, that he, who bargains in a matter of advantage with a person, placing a confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other." (1 Story's Eq. Jur.—12th ed.—secs. 310, 311). The attorney, who bargains in a matter of advantage to himself with his client, is bound to show that the transaction is fair and equitable, and that he fully and faithfully discharged his duties to his clients. (*Willin* v. *Burdette,* 172 Ill. 117, and cases there referred to). In such cases, the burden of proof rests upon the attorney to show "fairness, adequacy and equity, and, upon a failure to make proof, a court of equity will treat the case as one of constructive fraud." (*Jennings* v. *McConnel,* 17 Ill. 148; *Morrison* v. *Smith,* 130 id. 304; *Ross* v. *Payson,* 160 id. 349). The rule, that such a transaction as this between an attorney and client must show fairness, adequacy and equity on the part of the attorney towards his client, is demanded by "a sound public policy." (*Zeigler* v. *Hughes,* 55 Ill. 288).

Where there is a purchase by an attorney of his client's property, "the transaction is presumptively fraudulent, and the burden is on the attorney to show fairness, adequacy and equity." (*Elmore* v. *Johnson,* 143 Ill. 513). It has been said by this court in *Hess* v. *Voss,* 52 Ill. 472, that "there is no rule of law, which prohibits an attorney from becoming a purchaser at a master's sale, even of land owned by his client, but in such cases the attorney must act in good faith. On such a purchase the conduct of the attorney will be closely scrutinized, and, if he has not acted with strict fairness, his purchase will be held to have been made for his client." (See also *Moore* v. *Bracken,* 27 Ill. 23).

The question then arises whether, in the purchase of this property by the defendant in error, Wallace, at the master's sale thereof in the partition suit conducted by himself, his conduct towards his clients was characterized by fairness, adequacy and equity.

*Second*—Wallace failed to make persons, holding mortgages or other liens upon portions of the property, parties defendant to the partition proceeding. Some of these mortgages or liens were held by himself, and were so obtained by him before he began the partition proceeding. Section 6 of the Partition act provides that "every person having any interest whether in possession or otherwise, and who is not a petitioner, shall be made a defendant to such petition." (3 Starr & Curt. Ann. Stat.—2d ed.—p. 2916). Section 15 of the Partition act provides that "the court shall ascertain and declare the rights, titles and interest of all the parties to such suit, the petitioners as well as the defendants, and shall give judgment according to the rights of the parties." (3 Starr & Curt. Ann. Stat.—2d ed.—p. 2919). In *Smith* v. *Higgins,* 152 Ill. 159, it was held that a judgment creditor of a party in a partition suit, whose claim is to be paid in the distribution, should be brought before the court, so that the amount remaining due upon his judgment may be ascertained. In a partition suit money should not be paid

to judgment creditors, or holders of mortgage or other liens, who are not parties to the suit, and, therefore, not before the court. The amount, remaining due upon such judgments or liens, should be ascertained before any distribution is awarded to the holders of them. In *Kilgour* v. *Crawford,* 51 Ill. 249, which was a suit for partition of lands, the bill stated that the premises were subject to a certain mortgage executed to one of the defendants, and the answer of the mortgagor defendant also set up the mortgage; but on the hearing, neither the mortgage was put in evidence, nor any proof offered in support of it, and, in the decrees of partition and sale which were subsequently entered, the court failed to make any mention of it, and it was there held that this was error, and that the court should have passed upon the mortgage, in such manner as to have clearly defined the interest, which would be acquired by a purchaser at the sale; and we there said (p. 252) : "In this uncertainty, it is evident the sale of the premises would be greatly injured. A person, desirous of purchasing, would not know whether he bought subject to the mortgage or not. The statute not only requires all persons, having either a present or contingent interest, to be made parties, but further requires the court, in its decree, to declare the rights and interests of all the parties."

On February 1, 1900, John B. Mansfield had executed a note for $1250.00 to one Craig, and secured the same by a mortgage upon a considerable portion of the property in question situated in Fayette county. Some time in 1900 Wallace, as the solicitor of Craig, filed a bill for the foreclosure of this mortgage, and, under a decree entered in the foreclosure proceeding on December 8, 1900, the lands were offered for sale and sold. The certificate of sale, issued to the purchaser, was on December 13, 1900, assigned and transferred to W. O. Wallace, so that on April 17, 1901, when he filed the bill for partition for the Mansfield heirs, he was himself the holder of this certificate of sale. The

holder of such certificate was not made a party defendant to the partition proceeding, nor did the papers or record in that proceeding reveal the fact that Wallace himself was the holder of such certificate. On March 17, 1899, John B. Mansfield had executed a mortgage to one C. J. Kurtz upon a portion of the property here in question to secure a note for $625.00. On March 9, 1901, this note, and the interest coupons attached thereto, were assigned by Kurtz to W. O. Wallace himself. Neither Kurtz nor Wallace was made a party defendant to the partition proceeding, nor did that proceeding reveal in any way to the court, or to outside parties, the existence of the mortgage to Kurtz. On November 25, 1899, John B. Mansfield executed a mortgage to secure $425.00 on a part of said property to Tallman and Barton, which note and mortgage appear to have been assigned to W. O. Wallace, and were held by him at the time of, or shortly after, the sale. Neither Tallman nor Barton nor their assignee was made a party to the partition suit, nor was any reference made to the Tallman and Barton mortgage in any of the partition proceedings. It also appears from the record that the mortgage, held by George A. A. Dieckmann, was transferred to Wallace on July 23, 1901, a few days after the sale of the property was made by the master, Yantis. The decree of sale provided "that all mortgages and indebtedness be paid out of the purchase price, or assumed by the purchaser." But, as to the mortgages just mentioned, (except the last) there was nothing in the decree, or in the partition proceedings, to disclose the existence of such mortgages to parties purchasing at the master's sale. As holders of such mortgages had not been made parties to the partition proceeding, and the court had made no finding as to the existence of such mortgages, it was impossible for the purchasers or persons, desiring to purchase at such sale, to know what mortgages and how much of a mortgage indebtedness they were to assume. Inquiries were made of the master by purchasers at the sale, which showed that they

were in doubt whether, when they paid certain amounts for property, their bids were subject to existing mortgages, or existing mortgages were to be deducted from the amounts of their bids. This uncertainty affected the sale, and deterred parties from bidding thereat. The master declined to furnish any information on the subject, but simply referred the parties to the decree, or to the notice of sale.

In his report of sale the master states that the purchasers, Wallace and Tackett, paid him one-half of the amount bid, to-wit, $11,520.00, in cash. This was not true. They gave him a check for $2000.00 in money in part payment of one-half of their bid, which one-half was $5760.00, and, as to the remainder of the $5760.00 after taking out the $2000.00, to-wit, $3760.00, Wallace settled that with the master by producing certain notes and mortgages held by himself. The master states that he knew nothing about these notes and mortgages until they were produced before him, and that they were produced by Wallace. Wallace produced before the master the certificate of sale that he held upon the land sold under the Craig foreclosure, and was given credit for a certain amount upon this. Wallace produced the Kurtz mortgage before the master, and was given by the master credit for a certain amount on account of this mortgage. He also produced before the master the Tallman and Barton mortgage, and received credit for a certain amount on account of that mortgage. There was also produced before the master a certain mortgage on a portion of the land in Jackson county, amounting to 120 acres known as the Lehman mortgage, and the master gave Wallace credit for a certain amount due upon this mortgage, but no mention was made of any of these mortgages in the decree. The court was unable to tell whether the correct amount had been paid in to the master for the benefit of the heirs or not, because the master reported that he had received $5760.00 in cash, when, as matter of fact, he had received $3760.00 of it by giving credit to Wallace for certain mortgages on the prop-

erty, produced by him, which were not mentioned in the decree, nor explained in the proceedings. It is quite clear that the correct facts in regard to the payment of the half of the $11,520.00 were not presented to the court by the master in any of his reports. We think it apparent from the record that the defendant in error, Wallace, who was an intelligent lawyer, beclouded the records in such a way, as to keep the real condition of the title concealed, so that purchasers were unable to bid intelligently.

One of the heirs of John B. Mansfield was a Mrs. Wilmay Torrence, and, in February or March, 1901, Wallace sent for Mr. and Mrs. Torrence to come to his office, and asked them to begin a partition suit. He told Mrs. Torrence that, if she would bring such suit, he would see that she would get well paid for it. She and her husband declined to give him authority to bring the suit, and he subsequently began the partition suit in the names of Jacob and Freeman Mansfield.

*Third*—John W. Yantis was the master in chancery who made this sale. Among the pieces of property, which he sold, was a certain 60 acres of ground in Shelby county. This tract of 60 acres was struck off and sold to Wallace, or Wallace and Tackett. Shortly after the sale was made, this tract of 60 acres was deeded to the wife of Yantis, the master in chancery. The master, Yantis, admits that he acted as the agent of his wife in this matter. When the property was transferred to Mrs. Yantis, the sum of $540.00 was credited on the mortgage, which had been given by Wallace and Tackett to secure one-half of the purchase money, and which was payable in one year. This tract of 60 acres had been appraised by the commissioners at $600.00, and there is testimony in the record going to show that it was worth upwards of $100.00. The testimony also shows that several parties were anxious to buy this 60 acres, and were promised by Wallace that, if they would not bid against him and would allow him to take the 60 acres, he would subsequently

deed it to them at the value at which it had been appraised by the commissioners.

*Fourth*—In addition to this, the evidence shows that Wallace sought to deter parties, who were inclined to bid at the sale, from making any bids. In other words, he discouraged competition by trying to induce persons, who were disposed to bid, to abstain from doing so. One Brownback testified that he desired to purchase the 60-acre tract in question, and talked with Wallace about it before the sale. He says that Wallace told him that he, Wallace, expected to buy the 60 acres, and to buy all the land. He said that the land would probably sell as a whole. Brownback swears distinctly that there was an agreement between him and Wallace that he, Brownback, was not to bid upon the tracts as a whole, and that Wallace was to let him have the 60 acres of land at the appraised value. He says that such agreement was made at the court house before the sale and on the day of the sale, and that his business was banking, and he was able to buy the whole of the property. He also says that he was prevented from bidding by the promise of Wallace, that the latter intended to buy the whole of the land, and that, when he did, he would transfer the 60 acres to Brownback at its appraised value. One Hadley swears that he had a conversation with Wallace before the sale, and Wallace told him he would send him a notice of the time of sale, but that he received no such notice from Wallace as to the date of the sale. He says that Wallace told him that the land would be sold in a bunch, and that, if he bought it, he would sell to Hadley the 80-acre tract which the latter desired to have. Hadley also says that he did not attend the sale because he thought the property was to be sold in a body, and he was anxious to get what was called the John Nolan tract, consisting of 80 acres. There is also testimony, tending to show that one Frailey, who had received a bond for a deed for 120 acres of the property from Mansfield in his lifetime, and still owed $1700.00 upon the purchase, would have been able to

pay the $1700.00, but was discouraged from doing so by Wallace, who held the notes that had been given by Frailey to Mansfield. The decree prepared by Wallace was drawn in such a way, as to cut off the interest of Frailey in the property, and declare it forfeited, and the property was struck off to Wallace and Tackett for less than Frailey would have paid upon it. One Westervelt, a physician residing in Shelbyville, testified that he made several bids upon the property, but that it was struck off to Wallace, and after the sale Wallace told Westervelt that the latter had run the price of the land up on him (Wallace), and that if he, Wallace, had seen Westervelt before the sale he would have obtained the property for less money. Without further discussion of the evidence, the conclusion is irresistible from the testimony of the witnesses that Wallace discouraged parties from bidding at this sale. "The law may be regarded as well settled, that the greatest fairness is required by those entrusted by law to conduct judicial sales, and those who purchase at such sales; and any agreement, contract or arrangement entered into, on the part of the bidders, calculated to stifle competition at the sale, is contrary to public policy, a fraud upon the law, and would vitiate the sale." (*Wilson* v. *Kellogg,* 77 Ill. 47). "It is a well recognized rule, that where a person, desirous of purchasing property at auction, prevents others, by his improper conduct, from bidding against him, and thus succeeds in purchasing the property at less than its fair market value, the sale will be set aside. So, agreements not to bid at a public auction are in general void, as against public policy, and tending to fraud, and such agreements, at least when brought about or participated in by the purchaser, will vitiate the sale." (*Ingalls* v. *Rowell,* 149 Ill. 163; *Quigley* v. *Breckenridge,* 180 id. 627). In *Garrett* v. *Moss,* 20 Ill. 549, we said (p. 553): "It is a well established doctrine that any corrupt agreement amongst bidders, which prevents competition at a public sale, is a fraud upon the owner, for which a sale should be set aside."

It is true that inadequacy of consideration, standing alone, is not sufficient reason to set aside a judicial sale, yet where the sale is attended by circumstances, showing that the purchaser desired to prevent fair and open competition, these, coupled with the inadequacy, are sufficient for setting the sale aside. (*Dutcher* v. *Leake,* 44 Ill. 398; *Lurton* v. *Rodgers,* 139 id. 554).

While the decree provided that the property should not be sold for less than two-thirds of the appraised value, yet this did not make it any the less the duty of the officer making the sale, or of the attorney conducting the proceedings, to realize as much more as possible from the sale than two-thirds of the appraised value. The property here was appraised by the commissioners in partition at something over $16,000.00, and there is testimony in the record tending to show that it was actually worth from $18,000.00 to $20,-000.00. In *Smith* v. *Huntoon,* 134 Ill. 24, we said (p. 30): "Although gross inadequacy of price, alone, will not be sufficient to avoid a sale under judicial process, yet it will, when combined with irregularity in making the sale, or even slight circumstances indicating unfairness or fraud, furnish sufficient ground for equitable interposition." In the case at bar, there were many circumstances, including those already detailed, and many irregularities which, considered in connection with the conduct of the attorney and the master, and the inadequacy of the price for which the property was sold, justify a court of equity in setting the sale aside.

*Fifth*—Among such circumstances is the fact, that the notice of the sale required to be given by the decree was not actually given. The notice of the sale did not state that the land would be sold free from all liens and encumbrances. The decree of sale required that the master should not only give public notice by publication in a newspaper in Shelby county, but also required that notice should be given "by posting written or printed notices thereof in at least five of the most public places in each Jackson, Fayette and Shelby

counties." The evidence does not show that notices were posted in at least five of the most public places in Jackson, Fayette and Shelby counties. It is shown by the testimony that the master himself posted no notices, nor made any effort to post any. Two notices appear to have been posted in Shelby county, and several in Fayette county, but there is nothing to show that any notice was posted in Jackson county. In his report of sale the master said that he caused notices "to be inserted for four successive weeks previous to the day of sale in the *Shelby County Leader,* a newspaper published weekly in the city of Shelbyville in said Shelby county, a copy of which notice, with the certificate of publication thereof, is hereto attached, and also by causing similar notices to be posted in five of the most public places in said county for the same length of time." The words, "in said county" refer back to Shelby county, and the master merely states that he caused notices to be posted in five of the most public places in Shelby county, but does not state that he caused them to be published in Jackson and Fayette counties. The report, as made by the master, was recorded by the clerk, and, as recorded, contained the word "county." Subsequently, the letter "s" appears to have been added in the original report to the word, "county," but with a comma between the "y" and the "s." The testimony shows that the original report, and other papers in the partition suit, were taken from the files by different attorneys and carried to their offices. At any rate, it is not clear that the master's report, as recorded by the clerk, which contains the word "county," thereby referring to Shelby county alone, was not made by the master as it purports to have been made, before the change indicated was made. The master himself gives no testimony whatever upon the subject. No evidence was produced to show that the claims, for which the master gave Wallace credit upon his purchase, were really just and valid claims against the land. In one case, where there was a mortgage on the land in Jackson county, the master acted judi-

cially and found that three-fourths of the note secured by the mortgage was the proper portion for Mansfield to pay, but, so far as this record shows, he acted without evidence, argument or notice. It was for the court to determine the liens upon the property, and not for the master to fix them after the sale, and without any finding by the court.

*Sixth*—It is claimed, on the part of the defendants in error, that Wallace was not himself alone the purchaser of this property, but that he was only a joint purchaser with Tackett. Wallace was the solicitor of record in the partition suit for the owners of this property, and Tackett had actual, as well as constructive, notice of this fact. "A party purchasing at a judicial sale is chargeable with notice of such material facts as the record of the proceedings, under which he derived title, discloses, and he will be presumed to have examined the same before becoming a purchaser." (*Webber* v. *Clark,* 136 Ill. 256). In *Alwood* v. *Mansfield,* 59 Ill. 496, it was held that, where a third person was a party with a solicitor in a transaction with clients of the latter, and sought to hold property thus secured, the burden was upon him, as it would have been upon the solicitor, to show that the transaction was in all respects just and fair. So, here, Tackett, by associating himself with Wallace in transactions concerning the clients of Wallace, placed himself under the same rules that govern Wallace, and the burden is upon him to show that the transaction was in all respects just and fair. Tackett was not present at the sale, and the master did not know that Tackett had any interest in the sale with Wallace, until he was directed by Wallace to put Tackett's name with Wallace's name in the certificate of sale. Wallace, having made the bids for Tackett in his absence, was in that regard Tackett's agent, and the knowledge, which Wallace as such agent had had, affected Tackett himself with notice. It has been said: "The principles * * * which govern the cases of dealings of persons standing in a fiduciary relation, apply to persons who clothe themselves with a character which

brings them within the range of the principle; or, who take instruments, securities or moneys, with notice that they have been obtained by a person filling a position of a fiduciary character, from a person towards whom he stands in such relation. * * * In the aplication of the principles of the court, there is no distinction between the case of one who himself exercises a direct influence, or of another who makes himself a party with the person who exercises the undue influence. * * * Whenever the circumstances of a transaction are such that the person who takes the legal estate in property, cannot also enjoy the beneficial interest without necessarily violating some established principle of equity, the court will immediatey raise a constructive trust and fasten it upon the conscience of the legal owner, so as to convert him into a trustee for the parties, who, in equity, are entitled to the beneficial enjoyment." (*Alwood* v. *Mansfield, supra.*) The case of *Alwood* v. *Mansfield, supra,* is similar in its facts to the case at bar, for the reason that, under the evidence in that case, the person, who made himself a party with the attorneys occupying a position of a fiduciary character, knew of the existence of the relation of solicitor and client.

The decree prayed for in this case cannot cause any loss to Wallace and Tackett. Their deed or deeds are held to be equitable mortgages, and they are to be paid all that they have expended for purchase money, taxes and improvements, together with interest, and to be charged with rents and profits, and, in case of sale to innocent purchasers without notice, with the excess of the amount realized over what they paid. They are only to be charged with the reasonable worth of the lands sold. Therefore, in case of a re-sale of the lands, Wallace and Tackett cannot be injured, inasmuch as the direction will be that if, upon such re-sale, no advance is made upon the sum paid by Wallace and Tackett, they shall be held to be purchasers. (*Thorp* v. *McCullum,* 1 Gilm. 614; *Lagger* v. *Mutual Union Loan Ass.* 146 Ill. 283; *Ebelmesser* v. *Ebelmesser,* 99 id. 541).

*Seventh*—It is said that plaintiffs in error are not entitled to relief upon the ground of *laches*. The claim is, that they should have filed exceptions to the master's report of sale. We do not think the record shows that the plaintiffs in error were guilty of *laches*. Wallace was their solicitor and attorney. He was acquainted with all the facts, and, if exceptions were filed to the master's report of sale, it was his duty to file such exceptions. As, however, he was not only solicitor for the owners of the property, but purchaser of the property, it was for his interest not to file such exceptions, and his clients cannot be chargeable with *laches* because of his neglect to do his duty in their behalf. Two of the plaintiffs in error were minors when the sale was made on July 19, 1901. They had a right, at any time until three years elapsed after they attained their majority, to file an original bill in the nature of a bill of review. The three years did not expire until 1904, and this bill was filed on October 10, 1903. The final report of the administrator, to whom so much of the proceeds of the sale as remained after discharging the mortgages, were directed to be paid, was not made until April, 1903. It also appears that many of the heirs, at least seven of them, were non-residents, besides the two who were infants. Where bills are filed to set aside transactions between parties standing in a fiduciary relation, the defense of *laches* is not regarded with favor. (*Ross* v. *Payson,* 160 Ill. 349; *Elmore* v. *Johnson,* 143 id. 513). A delay from November 19, 1881, to June 8, 1887, where heirs were scattered over several States, has been held to be no bar. (*Ingalls* v. *Rowell,* 149 Ill. 163). The facts in regard to the manner, in which Wallace was allowed to make his cash payment upon the sale by turning in outstanding claims which he had bought up, were not revealed by the master's report, nor by any portion of the record in the partition suit, and knowledge of those facts was not obtained by the plaintiffs in error until after the partition suit was ended. *Laches* cannot be charged upon one seeking to set aside a public sale of real estate on

the ground of fraud, actual or constructive, until after his knowledge of the facts, or of circumstances sufficient to put him on inquiry, which would have led to such knowledge. (*Williams* v. *Rhodes,* 81 Ill. 571; *Grimes* v. *Grimes,* 143 id. 550; *Haines* v. *Hewitt,* 129 id. 347).

*Eighth*—The solicitor's fee of $1200.00, which was allowed to Wallace in the partition decree, was improperly taxed as costs, and he should account for the same to the heirs. Section 40 of the Partition act provides that "in all proceedings for the partition of real estate when the rights and interests of all the parties in interest are properly set forth in the petition or bill, the court shall apportion the costs, including the reasonable solicitor's fee, among the parties in interest in the suit, so that each party shall pay his or her equitable portion thereof, unless the defendants, or some one of them, shall interpose a good and substantial defense to said bill or petition. In such case the party or parties making such substantial defense shall recover their costs against the complainant according to equity." (3 Starr & Curt. Ann. Stat.—2d ed.—p. 2927). The reasonable solicitor's fee can only be apportioned, as a part of the costs, among the parties in interest in the suit, when the rights and interests of all such parties are properly set forth in the bill or petition. They were not properly set forth here, but, on the contrary, necessary parties holding liens were purposely omitted. (*Hartwell* v. *DeVault,* 159 Ill. 325; *Metheny* v. *Bohn,* 164 id. 495).

The decree of the circuit court of Shelby county is reversed, and the cause is remanded to that court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*