(No. 20355.—)

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator,
*vs.* VINCENT P. PACE, Respondent.

*Opinion filed October 21, 1933—Rehearing denied Dec. 14, 1933.*

JOHN L. FOGLE, for relator.

JAMES J. BARBOUR, (VINCENT P. PACE, *pro se,*) for
respondent.

Mr. CHIEF JUSTICE ORR delivered the opinion of the
court:

Upon leave granted, an information was filed by the
Chicago Bar Association to disbar respondent, Vincent P.
Pace. An answer denying all charges of wrongdoing was
filed by respondent, and the matter was referred to a com-
missioner to take the proofs and report his findings to this
court. The commissioner served respondent with a copy
of his report on April 13, 1932. To this report respond-
ent failed to file objections. He attended the hearings be-
fore the commissioner and cross-examined some of the
witnesses of relator but offered no evidence in his own
behalf. After the commissioner had presented· his report

a motion of respondent was allowed by which the matter was opened in order to permit him to present his proofs. After taking additional evidence the commissioner presented a supplemental report, which, like the original report, found the charges laid in the information to be true.

The information contained four charges, each alleging a separate wrong perpetrated upon different clients by the respondent.

Charge 1 accused respondent of collecting payment upon a trust deed and note which his client, Vincent Zaccardi, held against Frank Scala in the amount of $3500 and interest thereon, and fraudulently diverting the money collected to respondent's personal use. The proof made by relator was as follows: Zaccardi, an Italian building contractor of Chicago, had at different times before October, 1926, retained respondent to represent him in legal matters. The trust deed and note which Zaccardi held against Scala matured about October, 1926. Zaccardi left the trust deed and note with respondent for the purpose of collecting payment of the debt or of renewing the obligation. At that time Zaccardi told respondent to charge himself with any money collected on the debt and to hold himself accountable therefor until Zaccardi returned from a trip to New York. On his return home Zaccardi called upon respondent, who had collected the principal of the debt in full with all of the interest, aggregating $3605. On this occasion Zaccardi said respondent advised placing the money out on another mortgage, and recommended as safe a loan upon certain Sheridan road property in Chicago which would pay six per cent and bring Zaccardi a commission of fourteen per cent. Zaccardi accepted this advice and directed respondent to make the loan and deliver the mortgage and note to him upon completion of the transaction. Proof by relator showed that respondent did not make the loan but instead converted Zaccardi's money to his own use without the consent of Zaccardi. After

repeated efforts to obtain his money had failed, Zaccardi accepted respondent's personal note for $3500, payable in October, 1929. On this note respondent paid $500 in 1927, this being the only payment. When the note became due respondent delivered to Zaccardi's wife two new notes, one for $1100, due in January, 1930, and a second for $2000, due April 1, 1930. Zaccardi took judgment on the $1100 note but has never realized any money on it. The $2000 note has never been paid.

With reference to this charge respondent offered proof before the commissioner to the following effect: That in 1926 respondent asked Zaccardi for a loan of $3000, which Zaccardi was willing to make but could not at that time; that in August, 1926, he came to respondent's office and requested him to draft a letter with reference to the Scala mortgage; that this letter was supposed to be signed by Scala; that the letter was written but was not signed by Scala and was turned over to Zaccardi; that Zaccardi then brought Scala and a lawyer over to respondent's office; that several weeks later Zaccardi delivered the Scala mortgage and note to respondent with instructions to write to Scala asking payment; that he also then instructed respondent to hold the papers if the debt was not paid and to start foreclosure proceedings; that in October, 1926, Scala paid the debt, amounting to $3605, to respondent; that he at once notified Zaccardi by telephone that the money had been collected and the latter came to his office the same day; that Zaccardi there said that he could make a $3000 loan to respondent, less $500 or $600, as he was going to New York that day or next; that respondent at this time gave to Zaccardi $105 in cash, a cashier's check for $500, a third cash item of $30, and his note for $3000 payable in October, 1929; that on this note he had paid $160 by credits for legal services rendered and had paid Zaccardi $540 in interest thereon over a period of three years; that when the note became due Zaccardi asked him

to pay, and he could not; that Zaccardi suggested extending the note by executing two new notes, one for $1100, which included a $100 fee for the extension, and a second for $2000; that Mrs. Zaccardi came for the new notes, took them, turned over the old note for $3000 and gave a receipt for the two notes, which receipt recited that the new notes took up the prior note, which was a personal loan to respondent.

Antonio Zaccardi related that he was with his father when he called upon respondent to handle the Scala mortgage. This visit was just prior to the father going to New York, in 1926. At the direction of his father he called upon respondent when the father returned from New York. He continued calling upon respondent at an average of three or four visits a month. In response to the invariable demand for the Scala mortgage money respondent would tell various stories. This witness said that respondent had not asked his father for a loan in his presence. When asked about a mortgage or trust deed as evidencing the re-investment of the money an evasive answer would be given the witness by respondent. He heard respondent tell his father that the money from the Scala mortgage had been placed in a mortgage loan on Sheridan road property along with $4000 of respondent's money. The mortgage matter could not be completed, according to respondent, as the woman who gave or was to give him the mortgage was dying because of an automobile accident.

Mrs. Zaccardi, as a witness for relator, told of making innumerable visits to the office of respondent, and once to his home in Wilmette, all for the purpose of demanding money. His replies were always excuses for delays. Respecting the two notes, Mrs. Zaccardi told of going to the office of respondent in the company of Vincent Radice, a business associate of her husband. Respondent gave her the two notes, one for $1100 and the second for $2000, taking from her the $3000 note, which was due. On one

visit respondent told her that the money had been given out for a mortgage but gave no names. He told her that the man's wife was sick and she could not sign the papers for a couple of months. He did not mention any specific property that the mortgage was to cover but told her that it was on Sheridan road.

Vincent Radice was with Zaccardi in respondent's office some time in 1927 or 1928 when Zaccardi told the witness, in the presence of respondent, that respondent had collected the Scala mortgage money and invested it in some other place. Respondent then said to them that he must make a mortgage upon some other place and when he got the trust deed he would give it to Zaccardi. The witness went to respondent's office afterwards with Mrs. Zaccardi when the $3000 note was exchanged for the $1100 and $2000 notes. On this occasion Mrs. Zaccardi asked respondent for money and he could not pay. Instead he gave her the two notes, taking the $3000 note, telling her at the time to get money out of the notes, as he had no trust deed and no money.

Frank Scala, a witness for relator, said that the mortgage he gave Zaccardi became due in October, 1926, and he paid it. He said he did not know respondent and had never seen him or had business dealings with him. He did not remember that respondent's name was signed to a letter sent to him by Zaccardi.

John E. Mollan, a Chicago attorney, testified for relator that he had been engaged by Zaccardi to collect the $1100 and $2000 notes from respondent. As a result he had many 'phone talks with respondent and some talks with him in person. On one occasion he asked respondent about the money derived from the Scala mortgage. Respondent told him that he had collected the money, and that he had a number of deals with Zaccardi and had borrowed the money from him. After a conference with the Zaccardi family the witness told respondent that his story did

not agree with what the Zaccardis had told, to the effect that respondent had re-invested the money collected, along with some of his own, in a Sheridan road property. Respondent then denied the truth of the Zaccardi version and said that Zaccardi had let him have the money as a personal loan.

The second charge of the information is, that Saveria Rovito (since married to Eugene Reda but referred to herein as Mrs. Rovito) employed respondent to secure a divorce from her husband. The divorce was obtained by respondent in July, 1927. At the time of the divorce proceeding the Rovitos were owners in joint tenancy of a bungalow, which they sold for $7500. Part of the purchase price was a second mortgage held by the Rovitos jointly. Prior to the divorce hearing a property settlement was agreed upon, by which Mrs. Rovito was to pay her husband $1250 for his interest in the second mortgage. About July 1, 1927, Mrs. Rovito gave to respondent $1250 to pay to her husband, securing in return the mortgage and note, with Rovito's assignment thereof. Respondent is charged with fraudulently converting the $1250 to his own use. The further charge is made that he collected installment payments upon the second mortgage to the amount of approximately $750, all of which he should have paid over to Mrs. Rovito, but that, on the contrary, he fraudulently converted the same to his own use. Failing to secure the money after repeated demands, Mrs. Rovito employed another attorney, who sued respondent. While the suit was pending respondent paid to Mrs. Rovito $100 in cash and gave her two notes signed by him, both dated February 14, 1928, one for $500, due in six months, and the second for $550, due in twelve months. The notes were never paid.

Mrs. Rovito testified for relator that she had employed respondent and turned over the $1250 to him to pay to her husband. Respondent was to act as trustee in collect-

ing the installment payments on the second mortgage. She exhibited receipts showing the payment of $125 to respondent as attorney fees in the divorce proceeding.

Eugene Reda, present husband of Mrs. Rovito, who acted as interpreter before the commissioner when Mrs. Rovito gave her testimony, was also a witness for relator. He testified that he took up Mrs. Rovito's matter with respondent when he was "going" with her before their marriage. He visited respondent in his office and attempted to get him and Mrs. Rovito in conference in order to determine what was coming to her. Respondent promised to do this but kept postponing the matter from week to week upon various pretexts, pleading incompletion of the matter and his personal lack of money. After many vain attempts an attorney was engaged, who instituted suit to recover the money. Before the case came to trial a settlement was effected, whereby respondent paid Mrs. Rovito $100 in cash and gave her the two notes above mentioned. There is a discrepancy between the record, the information and the testimony as to the amount of the second note. Reda says $250; respondent says $500; the information $550. A careful study convinces us that $550 was the face amount of the note. The two notes do not appear in the record as exhibits. To secure the two notes respondent and his wife gave a trust deed upon property in Lake county, Illinois. This instrument was, in fact, a fourth mortgage and of no real value. Respondent admitted to Reda that he had collected installment payments on the second mortgage but claimed he had paid the money collected to Mrs. Rovito. She denied this, and respondent failed to show any receipts when the matter was in court.

Respondent testified that he had represented Mrs. Rovito and her husband when the bungalow was sold and the second mortgage taken. This second mortgage was held by both. He said that Mrs. Rovito on different occasions sought to divorce her husband but that he was able

several times to bring about a reconciliation. Finally, he said, Mrs. Rovito insisted upon a divorce, and he told her his fee would be $125, which she agreed to pay. He filed the bill for divorce. Soon thereafter Mrs. Rovito told him (quoting respondent's version of what she said): "Mr. Pace, I will be glad to give all the opportunities to my husband, but you know he is no good. He spends all the money. If you succeed to procure all the furniture which he has in his possession, the $3000 mortgage which is now represented, less the $2900, I will give you one-half of that amount as fees besides what I have paid you heretofore." Respondent says he accepted the agreement. The divorce and the mortgage were obtained, and respondent told his client that if she paid him the sum of $1200 at once he would allow her $300. In two days she paid him a first payment of $1059 and a last payment of, he thought, around $100. He said that the Pecoras, the mortgagors under the second mortgage, knowing that Rovito and his wife were about to separate, were afraid to pay the installments to them, so they made several payments to him. These, he said, he immediately paid over to Mrs. Rovito. He exhibited receipts and canceled checks evidencing payments of installments aggregating $250. He said that all the money he ever collected on the Pecora mortgage had been accounted for. He further explained the payment of the $100 to Mrs. Rovito and the making of the two notes secured by the mortgage on the Lake county property as being due to fear of Reda, stating that Reda had threatened to harm him. Respondent sold the mortgaged real estate but never paid the notes, as he said they were obtained by duress and were given without consideration.

We deem it unnecessary to lengthen this opinion by a recital of the third and fourth charges in the information. They have nevertheless received our careful consideration. In the main they are similar to the matters above discussed, in that respondent is charged with gross

misappropriations of his clients' money to his own use. Extreme difficulty was encountered in analyzing the evidence because the evidence concerning each count was not segregated in the abstract. Respondent also failed to incorporate vital testimony into the record, so that the record as made before the commissioner was not fully presented to this court. Counsel for respondent ardently disclaims any ulterior motive in presenting such a record, and relator by an additional abstract has brought to light the missing parts of the record.

The first charge of the information is supported by the testimony of the elder Zaccardi. His testimony, in turn, is corroborated upon material points by the testimony of his son, Antonio. Mrs. Zaccardi also gave material support to the version given by her husband. All, including respondent, are in accord that respondent collected the money on the Scala mortgage. From the collection point the evidentiary trails of relator and respondent diverge. Zaccardi said the first note given to him by respondent was for the principal sum of $3500, and $500 of the principal has been paid. Respondent says that the first note he gave to Zaccardi was for $3000 and evidenced a personal loan. He secured the return of his first note to Zaccardi when he gave the notes for $1100 and $2000 in lieu thereof. To substantiate his version that his first note was $3000 and not $3500, respondent failed to offer the canceled note in evidence or any evidence that the note was not in existence. Zaccardi said he had received one payment of $500 on the principal; respondent said he paid him $500 by a cashier's check as part payment of the remainder of the collected amount after the $3000 was loaned to him. The canceled check should have been introduced in evidence if obtainable. The date thereof would clearly determine which version was correct as to the payment. Respondent said that he saw Zaccardi the same day the money was paid in by Scala. The greater weight of the

testimony is that the elder Zaccardi and his son were in New York at the time. Certain cash payments were made by respondent at the time he gave the $500 cashier's check to Zaccardi, but no receipts covering those payments were given in evidence by respondent to support his otherwise uncorroborated testimony on this point. Evidence is lacking that he did not take receipts, or, if taken, that they were subsquently destroyed or lost. Under the circumstances we cannot indulge in a presumption that receipts were not taken. In other matters concerned in the charges laid in the information respondent took and gave receipts as acts of custom and as a matter of course. In a case of this nature the burden is upon the attorney to prove or disprove. *Mansfield* v. *Wallace,* 217 Ill. 610; *Warner* v. *Flack,* 278 id. 303.

The respondent further stated that Scala was brought to his office by Zaccardi and that Scala's lawyer accompanied him. Zaccardi never testified to having Scala in respondent's office. Scala said that he did not know respondent, never saw him and had no business dealings with him. The attorney who was with Scala according to respondent was not called as a witness by him, therefore his story about the Scala visit to his office stands alone and is emphatically denied by Scala. John E. Mollan, the attorney for Zaccardi, said respondent always maintained that the money had been loaned to him personally. When he finally succeeded in getting respondent to face the three Zaccardis in his office in an endeavor to thresh out the trouble, he had the three relate in English to respondent their version of the matter. Respondent persisted, over the expostulation of Mollan, in answering the Zaccardis in Italian—a language which Mollan did not understand. Mollan repeatedly asked respondent to use English so he could understand what was being said, but without avail. At no time during this conference did respondent ever say in English that he had not collected the money or that the

version of the Zaccardis was wrong. Such conduct of respondent at the conference, which he has not denied, convinces us that what the Zaccardis said about respondent handling the Scala mortgage money is correct and that the story of respondent cannot be believed. The proof offered by relator to support the first charge of the information more than substantiates the charge. The version offered by respondent, compared with the proofs of relator, is not consistent, reasonable or probable. His story is nothing more than an adept attempt to clear himself of a compromising situation. His testimony does not support his plea of a personal loan.

A consideration of the proof for and against the second charge of the information leads to the following observations: Respondent told Mrs. Rovito that his fee would be $125 for securing the divorce, and this, respondent admits, she paid. A comparison of the whole testimony of Mrs. Rovito with that of respondent establishes in a reasonable mind the utter improbability of respondent's story. The total face value of the Pecora second mortgage was only $3000 and Mrs. Rovito had a half interest in this mortgage. Respondent would have us believe that she would, in effect, surrender her half interest as a fee to him if he would secure for her the half interest of her husband in the property. The record discloses that Mrs. Rovito is not well educated, but she was far from showing herself so lacking in native intelligence as to make such a proposition. Respondent in his testimony presumed to quote the language used by Mrs. Rovito in stating her proposition. A careful study of this does not substantiate respondent's version. In her promise to "give you one-half of that amount as fees," the phrase "that amount" can only refer to the prior language, "the $3000 mortgage which is now represented, less the $2900." That would be one-half of the difference between the face value and the actual value, or one-half of $100. The conduct of respondent in giving the

two notes and the cash payment are not at all in accord with his statement that he was entitled to the money as a fee. To offset this glaring situation he pleads fear of harm from Mrs. Rovito's newly acquired husband, Reda. From his subsequent action we are constrained to believe that what he really feared was having his action aired before a court, and not Reda. The evidence in the Rovito matter offered by relator before the commissioner does not leave any doubt in our minds but that respondent converted the money to his own personal use.

The whole evidence clearly shows that respondent is a highly educated man of Italian blood. Numbered among his clients were people of his own blood lacking in knowledge generally, and especially so as to commercial practices and customs. Varying degrees of illiteracy, coupled with their sparse knowledge of the English language, handicapped them in dealing with a person of intelligence who had the will and ability to harm them. Each of the complaining clients was shown to have placed great confidence in respondent as a trustworthy lawyer, for they left their money and valuable papers with him. The evidence shows that this confidence was violated and that respondent converted their money and property to his own personal use without right or reason. Accompanying his fraudulent actions were his consistent denials of wrongdoing to clients and their representatives, later followed by his tacit admissions of their falsity by giving them his worthless paper promises to pay back the money.

Where a person receives money belonging to clients and converts the same to his use he is unfit to practice law and should be disbarred. (*People* v. *Kwasigroch,* 296 Ill. 542.) Good moral character is a condition precedent to the right of an attorney to practice law. This includes honesty and frankness towards the attorney's client and is inconsistent with the endeavor to obtain part of the property of the client by wrongful means, even though the means employed

is not denounced by a criminal statute. *People* v. *Gilmore,* 345 Ill. 28.

The original and supplementary reports of the commissioner are approved. An order will be entered making the rule in this case absolute and striking the name of Vincent P. Pace from the roll of attorneys of this court.

*Rule made absolute.*